**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Dave Thomas,                                           Civil No. 11-839 (DWF/LIB)

　　　　　　Plaintiff,

v.                                                          **MEMORANDUM**
                                                        **OPINION AND ORDER**

United Steelworkers Local 1938;
United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union; and John Malec,

　　　　　　Defendants.

---

Judith K. Schermer, Esq., Judith K Schermer PLLC, counsel for Plaintiff.

John G. Engberg, Esq., and Mark W. Bay, Esq., Peterson Engberg & Peterson; and Sasha Shapiro, Esq., United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Industrial and Service Workers Int'l Union, counsel for Defendants.

---

**INTRODUCTION**

　　This matter is before the Court on a Motion for Summary Judgment (Doc. No. 29) brought by Defendants United Steelworkers Local 1938 ("Local 1938), United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), and Jon Malek[1] ("Malek").  Local 1938 and USW are referred to together as the "Union" and all defendants are referred to

---

[1]　　The Court uses the spelling of Jon Malek, as used in the Declaration of Jon Malek. (Doc. No. 40.)

collectively as the "Union Defendants."  For the reasons set forth below, the Court grants

Union Defendants' motion.

## BACKGROUND

United States Steel ("USS") is a steel producer that owns and operates several iron

ore mines, including the Minntac facility in Mountain Iron, Minnesota.  (Doc No. 40,

Malek Decl. ¶ 2.)  USW is the collective bargaining agent of bargaining unit employees

of USS.  (*Id.*)  Local 1938 is the local union chartered by USW to carry out certain

functions at USS's Minntac facility.  (*Id.*)  Malek has been the Vice President of

Local 1938 since 2003.  (*Id.*; Doc. No. 37, J.A. at 59 (Malek Dep. at 6-7).)  USS and

USW are parties to successive Collective Bargaining Agreements ("CBAs") that govern

the terms and conditions of employment for bargaining unit employees at the Minntac

facility.  (Malek Decl. ¶ 3.)

Plaintiff Dave Thomas ("Thomas") is a long-time employee of USS.  (Doc.

No. 49, Thomas Aff. ¶ 2; J.A. at 7 (Thomas Dep. at 10).)  Thomas has been a member of

the USW and Local 1938 since he began working in 1973.  (*Id.* at 8 (Thomas Dep.

at 14-15).)  In 2003, Thomas was assigned team leader duties in the "Pit."  (Doc. No. 49,

Thomas Aff. ¶ 3; J.A. at 10 (Thomas Dep. at 22).)  The Pit is an area of the facility that is

approximately 10 to 15 miles long and 5 to 6 miles wide.  (Thomas Aff. ¶ 12.)  As a team

leader, Thomas supervised 25-28 truck drivers, 8 mobile equipment operators, and 8

shovel runners.  (*Id.* ¶ 11.)  Thomas performed these duties until 2009.  (J.A. at 11

(Thomas Dep. at 25).)  Profanity was not uncommon in the Pit, and the daily language

used at Minntac has been described as "salty" or "rough."  (J.A. 100 (Woods Dep. at 16); 144 (Croteau Dep. at 18).)

Until 2003, the CBA at the Minntac facility included the following job description for Team Leaders:  "A Team Leader shall be responsible to lead the overall task execution by the work team, perform administrative functions, and participate in the hands-on performance of his team's work."  (Malek Decl. ¶ 4, Ex. 1 at 263.)  In the 2003 CBA, the position of Team Leader was eliminated.  (*Id.* ¶ 5, Ex. 2.)  Instead, the administrative and directional duties previously assigned to the Team Leader position were incorporated into new maintenance and production job descriptions, including Operating Technician I ("Op Tech I"—Mobile Equipment Operator or Truck Driver), Operating Technician II ("Op Tech II"—Shovel Runner), Maintenance Technician Mechanical ("MTM"), and Maintenance Technician Electrical ("MTE").  (*Id.*)  The current job description for the position of Op Tech II, Labor Grade 4, includes:  "Directs other operating and support crew members, performs administrative duties, and communicates with maintenance, as required to maximize production."  (Doc. No. 35, Mattson Aff. ¶ 5, Ex. A at 212.)  Op Tech IIs who also perform administrative and directional duties are informally referred to as "team leaders," and team leader duties fall within the description of Op Tech II.  (J.A. at 128 (Sterk Dep. at 48-49).)

During Thomas's tenure as a team leader in the Pit, Malek and Mike Woods, the President of Local 1938, received numerous complaints about Thomas.  (J.A. at 65-73 (Malek Dep. at 28-60), 98-100 (Woods Dep. at 12-19).)  Union Defendants claim that roughly half of the complaints related to Thomas's assignment of overtime, and roughly

half related to the way Thomas treated crew members and, in particular, his use of abusive language. (*Id.*) All of the complaints were made via telephone and all of the complainants refused to give their names. (*Id.*) Union Defendants claim that Malek and Woods discussed these complaints with Thomas's direct supervisor, Lou Janezich ("Janezich"), the Area Manager of the Pit, and that Janezich preferred to resolve conflicts on his own without involving the Labor Relations Board. (J.A. at 66-67, 69-72 (Malek Dep. at 33-37, 47-56); J.A. at 99 (Woods Dep. at 15-19).) Union Defendants also assert that after they discussed Thomas with Janezich, complaints about Thomas would stop for several months. (J.A. at 70 (Malek Dep. at 50); 101 (Woods Dep. at 22-23).) Union Defendants claim that Woods attempted to contact Thomas by phone, to no avail, and that Malek asked a griever, Rick Stoehr, to talk to Thomas, but that Thomas told him "You and your Union can go fuck yourselves." (J.A. at 69 (Malek Dep. at 46); 101 (Woods Dep. at 21).) Thomas denies that Janezich spoke with him, and does not recall if Stoehr spoke to him, about his performance as a team leader. (J.A. at 48 (Thomas Dep. at 74).)

In 2008, the overtime policy with USS changed, eliminating team leaders' discretion in assigning overtime. (*Id.* at 72 (Malek Dep. at 57-58); 99 (Woods Dep. at 14-15).) Since the change, neither Woods nor Malek have received any complaints about Thomas' assignment of overtime. However, they have received complaints about how Thomas related to his crew, such as his demeanor and "the way that he talked down to people." (*Id.* at 100 (Woods Dep. at 16-17).)

On April 4, 2009, Thomas heard a report over his radio that a truck driver, Roy Varani, thought there was a piece of metal missing on a piece of equipment. (J.A. at 11 (Thomas Dep. at 26).) Thomas immediately called the truck driver, who reported the missing metal, and the shovel operator, Dan Sixberry, and told them not to load the truck until Thomas arrived. (J.A. at 13 (Thomas Dep. at 33); Thomas Aff. ¶¶ 29, 30).) When Thomas arrived, he discovered that the truck had been loaded and that Varani and Sixberry were on the ground looking at the shovel; they had determined that nothing was missing from the shovel bucket. (J.A. 13 (Thomas Dep. at 26); Thomas Aff. ¶ 31).) Thomas was upset with the two men for not following the safety procedure. (J.A. at 15 (Thomas Dep.at 41).) Thomas asked Sixberry why he loaded the truck, to which Sixberry responded, "I don't need to listen to this bullshit" and walked away. (J.A. at 13 (Thomas Dep. at 34).) Varani testified at his deposition that he tried to explain what he had done, that he and Thomas began yelling at each other, and that Thomas said something to the effect of "[n]o wonder the crew said you were a dumb f---ing truck driver." (J.A. at 14 (Thomas Dep. at 37); Thomas Aff. ¶¶ 31, 32, 34.)[2] Thomas asserts that he immediately knew that he should have used different words and claims that he tried calling, but did not reach, Varani over the weekend to apologize. (Thomas Aff. ¶ 36.) Thomas told the Shift Manager, Scott McDermid, what had happened, and McDermid prepared an incident report. (Thomas Aff. ¶ 35.)

---

[2]     According to Thomas, a similar problem had occurred two weeks prior and Thomas instructed Varani how to tell if there was missing metal and that other crew members called Varani a "dumb f---ing truck driver." (Thomas Aff. ¶ 33.)

On April 6, 2009, the Area Manager of Mine Operations, Mike Sterk, organized a "fact-finding" meeting because Varani had lodged a report of harassment based on the April 4 incident.  (J.A. at 118 (Sterk Dep. at 11, 19).)  USS representatives present were Sterk, Jason Croteau (Assistant Shift Manager), and Nicolas Simonson and Katrina Donovan (both from Labor Relations).  (*Id.*)  The three bargaining unit employees involved in the April 4 incident, Thomas, Varani, and Sixberry, were also present.  (*Id.*)  In addition, Malek and grievance representative, Jake Schmelzer, were present.  (*Id.*)  USS and Union representatives met with each employee separately.  Thomas claimed that this was an isolated incident.  (J.A. at 48 (Thomas Dep. at 175).)  Malek then stated that he had received "20 complaints" about Thomas.  (Thomas Aff. ¶ 44; J.A. at 26 (Thomas Dep. at 88); J.A. at 48 (Thomas Dep. at 174-75).)[3]  Thomas remembers that Malek also stated, "if I had my way you would be off the property."  (¶ 45.)  In addition, Thomas asserts that Malek made the following comments at the April 6 meeting:  (1) that Thomas had been verbally abusive to others for the last five years; (2) that Thomas had been making threats and throwing his weight around for at least five years; (3) that Thomas and two other team leaders in the Pit are the biggest sources of complaints Malek received; (4) that Malek was tired of getting complaints about Thomas, did not want Thomas talking the way he did, and that "the rest are afraid" of Thomas; and (5) that Thomas was a "prick," that Malek was "tired of his crap," and was "not going to put up

---

[3]      The record is unclear as to what Malek said exactly, and Malek may have said that he had received 20 complaints, "more than" 20 complaints, or "at least" 20 complaints. (J.A. at 26 (Thomas Dep. at 88); J.A. at 48 (Thomas Dep. at 174-75).)

with his shit anymore."  (Doc. No. 33, Second Amend. Compl. ¶¶ 70-71; J.A. at 231-232, 238, 240. )

A day or two after the meeting, Sterk removed Thomas from his assignment as team leader.  (J.A. at 125 (Sterk Dep. at 37).)  Sterk explained to Thomas that he was going to be reassigned.  (J.A. at 126 (Sterk Dep. at 41).)[4]  In March 2010, Sterk returned Thomas to the team leader position.  (J.A. 126 (Sterk Dep. at 42-43).)  Malek asserts that shortly after Thomas became team leader again, Malek received three phone calls within minutes of each other from individuals expressing anger that Thomas was back in that position.  (J.A. at 80-81 (Malek Dep. at 91-95).)  Malek called Sterk and explained that having Thomas as team leader would "cause problems" and asked Sterk to remove him.  (*Id*. at 82 (Malek Dep. at 96-97).)  Sterk reassigned Thomas again.  Thomas did not file a grievance under the CBA over his removal from the team leader position.  Thomas did, however, file an internal Union complaint against Malek in April 2010, accusing Malek of failing to represent him at the April 6, 2009 meeting.  (J.A. at 48 (Thomas Dep. at 175-76).)  In September 2010, Thomas learned that the Union would not do anything further with the complaint.  (*Id*. at 49 (Thomas Dep. at 177).)

Thomas brought this action on April 5, 2011.  (Doc. No. 1.)  In his Second Amended Complaint, Thomas asserted five causes of action against Union Defendants, as well as against USS, including claims for violation of the Labor Management Reporting and Disclosure Act ("LMRDA"); breach of fair representation; defamation; tortious

---

[4]     Sterk testified at his deposition that Thomas was reassigned because of a work reduction at the plant.  (J.A. at 126 (Sterk Dep. at 41).)

interference with contract; and conspiracy.  (Doc. No. 33, Second Am. Compl.)  In his

opposition to Union Defendants' motion for summary judgment, Thomas states that the

"CBA is not implicated in any of Plaintiff's claims and as such [he is] dismissing all

claims except the defamation claim and the breach of the union constitution claim."

(Doc. No. 48 at 34.)[5]  The Court addresses the two remaining claims below.

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*,

92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in

the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*,

---

[5]      All of Thomas's claims against USS were dismissed with prejudice, pursuant to
the parties' stipulation.  (Doc. No. 55.)

47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Breach of Union Constitution

In his Second Amended Complaint, Thomas does not specifically allege a cause of action for the breach of the union constitution.  Instead, to assert the cause of action, Thomas appears to rely solely on vague references in the Factual Allegations section of his Second Amended Complaint.

A plaintiff's complaint must provide fair notice of the claims asserted against a defendant.  *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056-57 (8th Cir. 2004).  A non-moving party may not raise a new legal claim for the first time in response to a motion for summary judgment.  *See id.* at 157 ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for purpose of avoiding summary judgment."); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).  Instead, the proper procedure for asserting a breach of the union constitution would be to seek to amend his complaint.  *Id.*  Thomas, however, has already amended his complaint twice.  (Doc. Nos. 16, 33.)  Thomas's Second Amended Complaint was filed on June 4, 2012, *after* the deadline for dispositive motions and just days before Union Defendants' memoranda in support of its motions for

summary judgment were due to be filed.[6]  Thomas had, but did not avail himself to, the

opportunity to amend to add a claim for a breach of the union constitution.  Therefore, the

Court concludes that the breach of the union constitution claim cannot be raised at this

late stage of the litigation and that any further leave to amend is properly denied.  *See,*

*e.g.*, *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065-66

(8th Cir. 2005).

**III.   Defamation**

Thomas's only remaining claim is his claim for defamation.  Thomas bases this

claim on several statements made by Malek.  Specifically, Thomas alleges that the

following statements made by Malek were defamatory:  (1) that 20 complaints had been

made regarding Thomas in his position as a team leader, and that Thomas engaged in

conduct sufficient to remove him from a lead position; (2) that Thomas was "verbally

abusive to others for past five years" and that if Malek had his way "[Thomas] would be

removed from the property"; (3) "Five years of Thomas throwing his weight around and

making threats"; "Thomas is an absolute prick.  I'm tired of his crap."; and upon

Thomas's return to the position of team leader in the spring of 2010, Malek's statement to

Mike Sterk— "You can't do that.  This is going to cause problems, it was a problem in

the past, and I don't want to have to deal with these issues again and I don't think you do,

either"—and claiming that he had received calls from crew members complaining about

---

[6]      The Second Amended Complaint was filed based on a stipulation between the
parties.  (Doc. No. 30.)  The stipulation noted that Thomas's defamation count was
amended to conform to discovery in the matter, and that Thomas withdrew his claims
under the Minnesota Whistleblower Statute.  (*Id.*)

Thomas's return.  (Second Am. Compl. ¶¶ 70-72.)  In addition, Thomas relies on these additional comments:  (1) that Thomas and two other team leaders in the Pit are the biggest sources of complaints Malek received; (2) that Malek was tired of getting complaints about Thomas; (3) that Malek did not want Thomas talking the way he did; and (4) that "the rest are afraid" of Thomas.  Union Defendants move for summary judgment on Thomas's defamation claim arguing that this claim is preempted by the Labor Management Relations Act ("LMRA"), that Malek's statements are protected by a qualified privilege, and that Malek's statements are not defamatory.

### A.    Preemption

The Court first considers whether Thomas's defamation claim is preempted. Section 301 of the LMRA, 29 U.S.C. § 185, applies to "[s]uits for violation of contracts between an employer and a labor organization."  29 U.S.C. § 185(a).  Section 301 preempts state-law claims that are "substantially dependent upon analysis" of the terms of a CBA.  *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *see also Lingle v. Norge Div. of Magic Chef*, *Inc.*, 486 U.S. 399, 413 (1988) (explaining that a state-law claim is preempted only if interpretation of a CBA is required).  If a state-law tort claim is based directly on rights established by the labor contract, or if the claim is "inextricably intertwined with consideration of the terms of a labor contract," the claim is preempted. *Lueck*, 471 U.S. at 213.  However, a claim is not preempted simply because the parties involved are subject to a CBA and the events underlying the claim tangentially involve the CBA.  *Id*. at 211-12.  To be preempted, a claim's resolution must require interpretation of a specific provision of the CBA.  *Meyer v. Schnucks Markets*, *Inc.*, 163

F.3d 1048, 1051 (8th Cir. 1998) (asking whether the claim itself is necessarily grounded in rights established by a CBA).

Here, Thomas claims that Malek's statements, namely that Malek had received complaints against Thomas and that Thomas had engaged in conduct sufficient to remove him from the team lead position, harmed his reputation and caused him to be removed from his position as team leader. Union Defendants submit that in order for Thomas to have been wrongly removed from his position as a team leader, the CBA must be analyzed. For example, Union Defendants assert that the Court would have to analyze and interpret the contractual provisions laying out job descriptions in the CBA for both Crew Leaders and Op Tech IIs who are given lead duties in order to determine whether Thomas held a leadership position under the CBA, and if so, whether Union Defendants met the requirements of removing Thomas from that position. Although the facts underlying Thomas's defamation claim are related to the CBA, it cannot be said that the defamation claim is based on rights established by, or is substantially dependent upon an analysis of, the CBA. Therefore, the Court concludes that Thomas's defamation claim is not preempted by the LMRA. *See Meyer*, 163 F.3d at 1050-51.

### B.    Qualified Privilege

A defendant may escape liability for a defamatory statement based upon qualified privilege. Minnesota law "recognizes a qualified privilege which exempts an employer from liability for defamatory statements about an employee so long as the statements are made in good faith and for a legitimate purpose." *Keenan v. Computer Assocs. Int'l, Inc.*,

13 F.3d 1266, 1269 (8th Cir. 1994) (citation omitted).  A communication may be

privileged if:

> made upon a proper occasion, from a proper motive, and . . . based upon
> reasonable or probable cause. When so made in good faith, the law does not
> imply malice from the communication itself . . . .  Actual malice must be
> proved, before there can be a recovery, and in the absence of such proof the
> plaintiff cannot recover.

*Id*. (quotation omitted); *see also Cavanaugh v. Burlington N.R.R. Co.*, 941 F. Supp. 872,

879 (D. Minn. 1996).  The qualified privilege analysis involves a two-step inquiry.  First,

the defendant must establish the existence of the privilege by proving that the

communication was:  (1) made upon a proper occasion; (2) made based on a proper

purpose; and (3) based upon reasonable and probable grounds.  *Cavanaugh*, 941 F. Supp.

at 879.  If a defendant successfully establishes the privilege, the burden shifts to the

plaintiff to demonstrate that the defendant acted with actual malice.  *Id*.

Here, most of the allegedly defamatory statements were made within the context

of a "fact finding" meeting wherein Union Defendants were looking into complaints of

harassment made against Thomas.  Malek's allegedly defamatory statements were made

at both the 2006 meeting and during a phone call to Mike Sterk in 2010.  Malek's

statements in 2006 were made in the context of an investigation into whether Thomas

should continue to perform lead duties.  The comments made during the 2010 phone call

were made to Sterk, a management representative, in the context of whether Thomas

should be given "lead" duties again.  All of the statements were made by Malek while he

was acting on behalf of other bargaining members and were based on complaints that

were lodged by other bargaining unit members against Thomas.  The Court concludes

that Malek's statements were, as a matter of law, made in furtherance of a legitimate investigation, and therefore were made upon a proper occasion and for a proper purpose. *Cavanaugh*, 941 F. Supp. at 880.

Moreover, the Court determines that the record demonstrates that the statements were based on reasonable or probable grounds. While Thomas clearly takes issue with the statements made by Malek, Thomas does not point to record evidence to undermine the grounds supporting Malek's decision to make the allegedly defamatory statements. The record shows that Malek (and Woods) received numerous complaints about Thomas while he was performing lead duties in the Pit over the course of several years. The Court finds that the record establishes that Malek's allegedly defamatory statements were based on reasonable or probable cause, and therefore are privileged as a matter of law.

Even though Union Defendants have established privilege, Thomas submits that Malek acted with actual malice. Actual malice can be established with evidence that a party knowingly made statements that are false or with the reckless disregard of whether the statements are false or not. *See Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 281 (1974). Here, Thomas argues that Malek acted in reckless disregard of the falsity of the statements because he relied on anonymous complaints, yet stated that he had received the alleged complaints to suggest that Thomas used abusive language for years and that other employees were afraid of Thomas. While malice is generally a question for a jury, here the Court concludes that no reasonable juror could find, based on the record before it, that Malek knowingly made false statements or made them with reckless disregard of whether the statements were false or not. Instead, the record

14

demonstrates that Malek did indeed receive numerous, albeit anonymous, complaints about Thomas's behavior.  Thomas has failed to submit any evidence that would disprove that Malek received such complaints.  Accordingly, the Court concludes that, under the circumstances described in the record, Malek's statements are conditionally privileged and cannot form the basis of a defamation claim.

### C.    Merits of Defamation

Even if the statements were not conditionally privileged, the defamation claim would still fail on the merits.  For a statement to be considered defamatory, it must be communicated to a third party, be false, and tend to harm the plaintiff's reputation in the community and to lower him in the estimation of the community.  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  Malek's statement that he had received "20 complaints" about Thomas is a representation of fact.  In the same vein, it could be said that Malek's statement that Thomas was among the team leaders in the Pit for which he received the most complaints was a representation of fact.  While Thomas has questioned the credibility of the alleged complaints that Malek received, based primarily on the fact that the complaints were anonymous, Thomas simply has not presented any evidence that Malek did not receive these complaints.  Thus, these statements cannot support Thomas's claim for defamation.[7]

---

[7]    Thomas also points to the fact that in his deposition Malek only described seven complaints.  The fact that Malek did not describe 20 complaints during his deposition does not make Malek's statement false, particularly where Thomas has not pointed to any other evidence to disprove that Malek (and Woods) did, indeed, receive numerous complaints.

In addition, the Court finds that the remaining allegedly defamatory statements made by Malek—such as "Thomas is an absolute prick" and "I'm tired of his crap"—are not actionable.[8]  Statements that cannot be interpreted reasonably as stating facts or that are not capable of being proven false are protected from defamation actions under the First Amendment.  *See Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995) (explaining the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)).  If the speaker is expressing a "subjective view, an interpretation, a theory, conjecture, or surmise," the statement is not actionable.  *See Schlieman v. Gannet Minn. Broad., Inc.*, 637 N.W.2d 297, 308 (Minn. Ct. App. 2001) (internal citation omitted). Courts consider four factors when determining whether a statement is actionable:  the statement's "(1) specificity and precision; (2) verifiability; (3) literary and social context in which it was made; and (4) public context."  *Geraci*, 526 N.W.2d at 397.  Whether a statement can be proven false is a question of law.  *Id.*  At most, the remaining allegedly defamatory statements made by Malek suggest that Thomas was difficult and that Malek subjectively was tired of the complaints.  Based on the ambiguous nature of Malek's words, these statements do not contain facts that can be proven false.  *See id.* (explaining that statements that the plaintiff "had poisoned the board" and was "out of control" could

---

[8]  Malek's statements—"[Thomas] has been making threats and throwing his weight around for the last five years" and that Thomas had been verbally abusive for the last five years—could be interpreted as stating facts.  However, when considered in the context in which these statements were made, as reflected by the record, they also show Malek's opinion that the anonymous callers who complained about Thomas's behavior felt threatened by Thomas.  This interpretation is supported by the evidence that when Malek asked complainants for their names, they refused, and one complainant stated "I am not giving you my name.  [Thomas] will come back on me and make my life a living hell." (J.A. at 70 (Malek Dep. at 51).)

not be reasonably interpreted as stating facts); *McGrath v. TCF Bank Savings*, 502

N.W.2d 801, 808 (Minn. Ct. App. 1993) (holding that the reference to someone as a

"troublemaker" failed to suggest verifiable false facts about the plaintiff); *Lund v. Chi. &*

*Nw. Transp. Co.*, 467 N.W.2d 366, 369 (Minn. App. 1991).  Thus, these statements are

not actionable.

     For the above reasons, the Court concludes that Thomas's defamation claim fails

as a matter of law.

## ORDER

     Based upon the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

     1.     Union Defendants' Amended Motion for Summary Judgment (Doc.

No. [29]) is **GRANTED**.

     2.     Thomas's Second Amended Complaint (Doc. No. [33] is **DISMISSED**

**WITH PREJUDICE**.

     **LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  October 5, 2012                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge